A. Barry Cappello (SBN 037835)
abc@cappellonoel.com
Leila J. Noël (SBN 114307)
lnoel@cappellonoel.com
Wendy D. Welkom (SBN 156345)
wwelkom@cappellonoel.com
CAPPELLO & NOËL LLP
831 State Street
Santa Barbara, California 93101
Telephone: (805) 564-2444
Facsimile: (805) 965-5950

Attorneys for Plaintiff

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**CENTRAL DIVISION**

KIMBERLY CANTIN, an individual.

Plaintiff,

vs.

COUNTY OF SANTA BARBARA, a municipal entity; WILLIAM BROWN, in his individual and official capacity as Sheriff-Coroner of Santa Barbara County; and DOES 1-20, inclusive,

Defendants.

Case No.: 2:21-cv-08253

**COMPLAINT FOR:**

1. **42 U.S.C. § 1983: Fourth, Fifth and Fourteenth Amendments;**
2. **Conversion;**
3. **Declaratory and Injunctive Relief**

**DEMAND FOR JURY TRIAL**

Plaintiff alleges:

## JURISDICTION AND VENUE

1. This is an action for injunctive relief and damages pursuant to 42 U.S.C. § 1983 based on continuing violations of Plaintiff's rights under the Fourth, Fifth and Fourteenth Amendments to the United States Constitution. Jurisdiction exists pursuant to 28 U.S.C. §§ 1331 and 1343 based on 42 U.S.C. § 1983 and questions of federal constitutional law. Jurisdiction also exists under the Declaratory Judgment Act, 28 U.S.C. §§ 2201(a) and 2202. Supplemental jurisdiction over Plaintiff's state law claims is pursuant to 28 U.S.C. § 1367.

2. Venue is proper in the Central District in that the events and transactions complained of herein all occurred in the Central District.

## PRELIMINARY STATEMENT

3. Plaintiff Kimberly Cantin ("Kim" or "Plaintiff") is the sole surviving parent of John Michael Cantin ("Jack"). Jack was killed during the Montecito Mudslide/Debris Flow on January 9, 2018. His body was never recovered. Kim is the statutorily designated person with the sole right to receive and dispose of Jack's remains.

4. The Sheriff-Coroner's Bureau gave up the search for Jack Cantin years ago. Kim never gave up. Since approximately May 2018, she continued to search. Finally, beginning in May 2021, some of Jack's remains were found.

5. All Kim wants is to bury the few remains she has of her son next to his father, who also died in the Mudslide. But she cannot: the Defendants are preventing her from doing that. Plaintiff is informed and believes that reason the Defendants are refusing to authorize the burial is to protect their original "expert" – who issued a woefully inadequate, substandard, and wrong opinion – from exposure, and the concomitant need to re-open and re-examine all their prior investigations in which he opined.

6. Kim provided the first two of the found bones to the Sheriff-Coroner's

Office for testing. The Coroner's expert, Dr. Frederick Snow, a former police officer, provided only a 4-page, minimal opinion which reached flawed conclusions, and returned the bones in pieces. The Defendants then indicated that they would take the matter no further.

7. When other bones were found, Kim agreed to provide one bone, only – a shin bone – for further DNA testing, after Defendant Sheriff-Coroner agreed to return it to her and consented to her keeping the rest of the bones in her possession. But now, the Defendants refuse to give the shin bone back. Instead, they demand that Kim agree to further testing on it. Worse, they now threaten Kim with unknown punitive action if she refuses to deliver all the rest of the remains for further inspection.

8. On information and belief, the Defendants know further testing would destroy the remains and leave no evidence on which to challenge the conclusions of their regular consultant, former police officer Dr. Frederick Snow.

9. Plaintiff has committed no crime. She just wants to bury her son's remains, and her pleas to be able to do this are being treated with outrageous disrespect as the Defendants apparently circle their wagons to protect their "expert" from further scrutiny.

10. Plaintiff sues Defendants herein for civil rights violations and state law claims for their failure to return Jack's shin bone to her as promised. Plaintiff also asks for declaratory and injunctive relief to preclude further testing on any of the remains, since this will destroy them and the threat to seize them for testing was made apparently only to protect the Defendants and their alleged expert. Finally, Plaintiff asks this Court to direct the Coroner to modify Jack's death certificate to confirm a medical cause of death, rather than list him as "missing," so she can bury her son's remains.

11. All allegations made in this complaint are based upon information and belief, except those allegations which pertain to Plaintiff, which are based on

personal knowledge. The allegations of this complaint stated on information and belief are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.

**PARTIES**

12. Plaintiff Kimberly Cantin ("Kim" or "Plaintiff") is a resident and citizen of Santa Barbara County.

13. Defendant County of Santa Barbara ("County") is a municipal entity with the capacity to sue and be sued, and a political subdivision of the State of California, and is sued in that capacity. The County's departments include the Sheriff-Coroner's Bureau and the Department of Public Health. Employees of the County have engaged in the acts complained of herein pursuant to the policies, practices and customs of the County.

14. Defendant William Brown is sued individually and in his capacity as the Sheriff-Coroner of Santa Barbara County (the "Sheriff").

15. Each of the Defendants, their employees and agent, participated personally in the unlawful conduct challenged herein and, to the extent that they did not personally participate, authorized, acquiesced, set in motion, or otherwise failed to take necessary steps to prevent the acts that resulted in the unlawful conduct and harm suffered by Plaintiff. Each acted in concert with each other, and the challenged acts caused the violation of Plaintiff's rights.

16. Plaintiff does not know the true names of defendants DOES 1-20, inclusive. Plaintiff therefore sues these defendants by those fictitious names. Plaintiff will ask leave of Court to amend this complaint and insert the true names and capacities of said defendants when the same have been ascertained. Plaintiff is informed and believes, and based thereon alleges, that each of the defendants designated herein as a "DOE" is legally responsible in some manner for the events and happenings herein alleged, and that Plaintiff's damages as alleged herein were proximately caused by such defendants.

## GENERAL ALLEGATIONS

17. In early December 2017, Santa Barbara County was hit by the Thomas Fire, then categorized as the worst wildfire in California history. The Thomas Fire denuded the landscape. When the rain arrived, the destruction from the Thomas Fire triggered mudslides, making the ground precarious and unstable.

18. On January 9, 2018, massive flows of water and mud tumbled down mountain slopes laid bare by the fire. Then huge debris flows, comprised of mud as thick as concrete and moving at speeds of up to 20 miles per hour, slammed into the neighborhoods below.

19. The city hardest hit by the mudslides was Montecito, a small community where the Cantin family lived. On the night of the mudslide, Kim and all of her family were swept away by the mud: her husband, Dave; their son, Jack, 17 years old; their daughter, Lauren, 14 years old; and their dog, Chester.

20. Kim, Lauren and Chester were swept away as the avalanche of mud, carrying trees 50 feet long and boulders the size of cars, slammed into the house, tearing it apart. Kim came to a stop approximately 200 yards from the house. Badly injured, she was taken to the hospital after she was found. Lauren was literally buried alive within approximately 100 yards from the house. She managed to breathe from only a small pocket of air, until her cries were heard and she was pulled from the mud and taken to the hospital. Dave, who was outside when the mud hit, was killed; he was swept down to the beach, where his body was recovered. Chester, found near Lauren, also was killed.

21. Jack's body was never recovered. He had been inside the house, and should have been found close to Kim, Lauren and Chester.

22. In the days after the Mudslides, the Search and Rescue teams were able to find all the missing bodies except those of Jack and a two-year old girl. After a few weeks, Sheriff Brown came to Kim's hospital room and told her that, while the crews were not still looking every day, they would look for Jack weekly.

However, in March 2018, Kim was told by one of the dog handlers from Search and Rescue, that contrary to what the Sheriff had said, the Sheriff's Office was *not* still looking for Jack weekly. Instead, it had stopped searching on the previous Superbowl Sunday.

23. Beginning in or about May 2018, Kim started her own search. She organized a group of core volunteers, and worked with a general contractor. Rick Stein, from the Sheriff's Search and Rescue team, also remained involved in the search. Kim rented ground penetrating radar equipment from Canada. She secured private property owners' approvals to search piles likely to hold Jack's remains. She obtained permits to dig up old wells in the flow zone. She initiated and attended a County meeting on where the debris was hauled and whether it was checked for remains. She created and delivered a letter (in English and Spanish) to workers. She ensured spotters were present when Flood Control was digging. She found many areas that had not been searched.

24. Plaintiff's main purpose during these years was to find Jack's remains. She kept a shovel, boots, mallet, hard hat and walking stick in her car as she searched the creek beds for years after the mudslides. After each rain, she searched. She and other volunteers ultimately found numerous Cantin-family artifacts, including but not limited to: a quilt she had made Dave; Jack's teddy bear, tee-shirt, homework and backpack; eyeglasses, Lauren's Christmas dress, Dave's poker chips, and other materials. But not Jack, or his remains.

25. In early 2020, two years after the mudslide, Kim reached out to UCSB for assistance. Dr. Danielle Kurin, from USCB's Anthropology Department, responded. Dr. Kurin, now a tenured professor, is the Director of the PL Walker Bioarcheology and Forensic Bone Lab at UCSB. She has published substantial literature on bone issues, and is regularly consulted by the Santa Barbara Police Department and the Lompoc Police Department.

26. Kim informed the Sheriff that Professor Kurin was now onboard in the

search effort. Among other things, Professor Kurin set up a class to search for the two missing children, obtained grant money, targeted hot zones, took multiple samples, worked on flow patterns, and created a porcine area to compare decomposition. Professor Kurin and her team worked for over a year, covering a targeted, over-110-acre search zone.

27. On or about May 10, 2021, the Professor and her team discovered suspected human bone. The team collected two specimens, a fragment of cortical bone, and a toe bone. The team confirmed they were bone, and Professor Kurin then notified Kim. The specimens had been found with artifacts from Kim's house, including remnants of carpet and remnants of Jack's underwear. Kim called the Sheriff and told him about the remains and where they were found, and asked about the next step. She also asked the Sheriff to treat the bones carefully since she wanted them back.

28. At the Sheriff's directive, Kim drove the bones to the Coroner's office in Goleta the next day. Kim told the officers at that time that the bones had to be treated very carefully (as she had told the Sheriff the day before); they were likely the only remains she had of her son. Despite knowing where the remains were found, the Sheriff's office never roped off that location, or sought to look further in that area. Kim was not given a receipt for the bones. Rather, she had to call and ask for a receipt, and then return to pick one up the next day.

29. Kim was then told that the Coroner's office was going to send the bones to Dr. Snow, at the Forensic Anthropology Consulting Services in Tennessee, for testing. Plaintiff is informed and believes that Dr. Snow is a former police officer, and that sending remains to him for testing is part of the policies, practices and customs of the Defendants.

30. On or about May 18, 2021, Officer Chad Beidinger told Kim that Dr. Snow said one of the specimens was over three years old and the other was a plant, not bone. Kim offered to pay for the cost of higher or more expensive analysis, but

Officer Beidinger told Kim that the department was taking it no further.

31. On or about May 26, 2021, Kim picked up the bones. Instead of two bones, however, there were four pieces: on information and belief, they had been manipulated either by the Coroner's office before it sent the bones to Dr. Snow, or by Dr. Snow, with pliers and/or saw, which damaged the bone evidence.

32. Kim was outraged by this disrespect shown toward the remains. Kim believes these remains are Jack's, based on credible forensic evidence which flatly contradicts the Snow report.

33. Kim subsequently obtained a copy of Dr. Snow's Report on or about May 28, 2021. On information and belief, the 4-page Snow Report was grossly inadequate, and simply wrong. In fact, it is not clear that Dr. Snow was looking at the same materials. Some of the manifest problems with the report included, *inter alia*, the following:

a. The Report stated that the toe bone was plant, not bone. However, no microscopic cross-section of the specimen was provided; instead, only an istock image of a plant was portrayed. By contrast, pXRF analysis by Professor Kurin and her team had previously confirmed this specimen had both phosphorous and calcium spikes, confirming it was bone, not plant.

b. The Report stated that the absence of osteological landmarks precluded identification of the species and bone from which the cortical specimen came. But Professor Kurin and her team were able to identify the remains as human in morphology and identifiable in terms of the human skeleton.

c. The Report concluded that the cortical bone was not recent, in part due to the friable nature of the edges, but also did not state that the bone was ancient or Native American. But Professor Kurin and her team concluded that the bone was not ancient, the edges were

not friable, and that the bone had been buried between 2-3 years, based on the lack of fluorine, and on soil chemistry and PH, recorded temperature, humidity and observations of decomposition.

d. The Report did not explain what methodology Dr. Snow used.

e. The Report did not reference Dr. Snow's sources.

f. The Report did not contain any information on the other related artifacts that had been retrieved with the bones, to assist with identification.

34. Moreover, on information and belief, internet research indicates that: Dr. Snow's field experience was limited and occurred 25 years ago; there is no evidence of recent certifications or trainings; he lacks publications as lead author; although he professes to be an adjunct professor at the University of Georgia, he was not listed by the department on its website; and he is not board certified.

35. The failings of the report were apparent. These failings, which make the Snow report unbelievable, were and have been apparently overlooked and/or entirely disregarded by Defendants. They were completely contrary to the findings and conclusions of Professor Kurin.

36. Professor Kurin's team had continued to search after May 10, 2021, through approximately mid-July 2021. They found additional bone remains, which they confirmed were human and which showed evidence of blunt force and/or thermal trauma, consistent with fires and the live electrical wires and transformers that had exploded during the mudslides. Those remains, like the original two, were also recovered with artifacts connected to the Cantin house, including but not limited to Jack's bathroom tile. After recovery, recording, and analysis, the bones were delivered to Kim, who understood that the Sheriff's Department had given up the search, and that this was a recovery situation, not a criminal investigation.

37. Professor Kurin's report concluded to a 90% of certainty, that the

bones were those of Jack Cantin. The report was based on numerous factors, including but not limited to the evidence that the bones had both calcium and phosphorous (they were not plant), the evidence that the bones showed indications of shin splints (Jack was an athlete), the circumstantial evidence of other Cantin artifacts found with the bones, the lack of fluorine (they were not ancient bones), and other factors. This analysis was peer-reviewed by Dr. Valda Black, of Washington State University, who found it detailed and scientifically sound. Dr. Black also opined that Dr. Snow's report failed to follow proper forensic reporting standards.

38. Only after Professor Kurin issued a "Fast Fact Forensic Report" to explain the analysis, did the Sheriff-Coroner's Office then decided to reassert jurisdiction. The media picked up the story, just as Kim scheduled a funeral and prepared to bury Jack's remains while the family was in town from Europe.

39. Kim was told the funeral home could not obtain a burial permit unless the cause of death on Jack's Death Certificate was changed from "missing" to some medical cause. Only the Coroner can request an amendment to a Death Certificate.

40. When Kim then asked the Sheriff to authorize a change in the cause of death, so the funeral could go forward, she was told she had to come in to talk. On or about August 3, 2021, Kim and her counsel brought all the remaining bones to a meeting with the Sheriff and the Undersheriff, Sol Linver.

41. At that meeting, the Sheriff agreed to take only *one* of the bones for rapid DNA testing at the Kern County lab, with Kim to retain the rest, and to return all excess bone and resulting remnants to Kim. The County pathologist, Dr. Manuel Montez, then examined all the bones and chose the shin bone for testing. On information and belief, Dr. Montez is not Board certified in forensic pathology.

42. The Sheriff confirmed to Plaintiff that he does have discretion to make certain calls when the evidence is not 100% certain, and promised to use his best efforts to get that approval. Kim left the meeting with the rest of the bones in her

possession, a receipt for the shin bone, and the Sheriff's promise to help her. She was hopeful at that time that the funeral could go forward.

43. On or about August 4, 2021, Kim received word that the Kern County lab thought the bones were animal, not human. When she was told that the DNA tests would continue, she specifically asked that the report detail all the steps they took, so she could take it to an independent lab. On or about August 6, 2021, Kim was told that the DNA efforts were inconclusive, but that the department could send the bone to Marshall University Forensic Lab. Kim did not agree, and was never given the Kern County lab report.

44. Jack's funeral was held on August 11, 2021. The Sheriff and other officers were in attendance, prominently standing front and center, and misleadingly appearing to the public as supporting Plaintiff. However, the Death Certificate had not been changed. Because the Sheriff would not change the Death Certificate, Kim could not bury her son's remains. She was forced to use an urn to hold his bones, and the Sheriff was present as she left with that urn.

45. Approximately one month later, on or about September 8, 2021, Kim was told that Professor Kurin's report was not enough. The Undersheriff again suggested sending the shin bone to Marshall University Forensic Lab for testing. Plaintiff is informed and believes that DNA testing of this sort will destroy the bone, since the process requires dissolving the bone to obtain the organic component, collagen.

46. Plaintiff is further informed and believes that the Marshall University recommendation was made solely to protect the Defendants from possible exposure from their use of Dr. Snow on other cases in which he provided inaccurate or patently wrong opinions.

47. Notably, the 2019-2020 Grand Jury Report recommended that the County separate the Coroner position and make it independent from the Sheriff. Such a separation might preclude the type of conflicts involved here, where

Defendants' demands were likely made in order to protect the finality of prior criminal or civil investigations. The Grand Jury Report also recommended that the County require the Coroner Bureau to meet the medical standards for accreditation set by the U.S. Department of Justice, which do not currently apply to the County Coroner Bureau.

48. Plaintiff is further informed and believes that, aside from the fact that further testing will destroy the bone, Marshall University is not an appropriate testing facility for numerous reasons. These include, but are not limited to: it is not a highest research university, only a master's program, which does not teach biostatistics and other techniques; its website lacks explanations on the standard operating procedures and instrumentation; the DNA Lab is run by a professor with a Master's Degree in Forensic Science, not a Ph.D., and who has only published in the cancer immunology framework, not DNA methods more generally; and the Forensics program is run by a professor with a Ph.D. in Education, not hard science, who has not published on forensic DNA.

49. All Kim wants is to be allowed to bury her son's remains. She has a favorably peer-reviewed report from an expert stating that the remains are Jack's to a 90% certainty. The only other opinion is the substandard and inaccurate one submitted to the Defendants by their "expert," which, on information and belief, the Defendants are trying to protect from scrutiny by threatening and intimidating Kim.

50. The Defendants now have refused to return the shin bone Kim loaned to the Sheriff's Office, despite the Sheriff's agreement to return it. Instead, the Defendants have indicated the Coroner plans to send it to Marshall University for further testing which will destroy it and any evidentiary value it might have. Kim has revoked her consent for the County to retain the shin bone.

51. Moreover, despite the previous agreement to use only *one* bone for the DNA testing, the Defendants are now threatening to seize all the bones and have demanded that Kim deliver the remaining bones in her possession to the Coroner

for further inspection. Finally, despite the sound report of Plaintiff's expert in forensic anthropology, the Defendants also refuse to request any amendment to Jack's Death Certificate, so Kim still cannot bury her son's remains.

52. Plaintiff has filed a Government Tort Claim with the County of Santa Barbara to exhaust any necessary administrative remedies.

**FIRST CAUSE OF ACTION**

**(42 U.S.C. § 1983: Fourth, Fifth and Fourteenth Amendments – Against All Defendants)**

53. Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

54. The Defendants and their employees and agents owe Plaintiff a duty under the due process clauses of the Fifth and Fourteenth Amendments to the United States Constitution to protect the personal property of the Plaintiff, who is statutorily designated to receive and direct the disposition of her son's remains.

55. The Defendants and their employees and agents also are bound not to violate Plaintiff's Fourth Amendment right to be free from unreasonable search and seizure of her property.

56. The Defendants have a policy, custom and/or practice of seeking the opinion of Dr. Snow, an unqualified expert, and of then taking action and relying on that unqualified expert's opinion.

57. Defendant Sheriff further promised to test only one of Plaintiff's son's bones, and to allow Plaintiff to retain the remainder of the bones in her possession.

58. The Defendants at all times relevant to this action were acting under color of state law.

59. Defendants have violated Plaintiff's rights under the Fourth, Fifth and Fourteenth Amendments by following the above-stated policy, custom and/or practice, and the Sheriff's promise, causing them: (a) to refuse to amend Jack Cantin's Death Certificate, thereby precluding Plaintiff from burying his remains;

(b) to refuse to release Jack's shin bone despite a promise to do so, after the testing was performed and knowing that further testing would destroy the bone; and (c) to threaten Plaintiff and demand that she deliver all remaining bones for testing, at pain of unknown consequences.

60. The Defendants' actions were based, *inter alia*, on their unlawful and improper desire to shield their unqualified expert from being discredited, and unlawfully to protect prior cases and investigations on which the expert opined from potentially being reopened.

61. Plaintiff is informed and believes that the acts of the Defendants and their employees and agents were intentional and/or, at minimum, deliberately indifferent to the likely consequences that Plaintiff would suffer severe emotional distress resulting from the Defendants' outrageous conduct, and their unreasonable and unlawful refusal to return the bone and allow her to bury her son's remains.

62. As a direct and proximate result of these unlawful acts, Plaintiff has suffered and continues to suffer and is entitled to compensatory damages.

## SECOND CAUSE OF ACTION

**(Conversion – Against All Defendants)**

63. Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

64. Plaintiff owned, possessed and/or had a right to possess the shin bone which constituted Jack's remains.

65. Defendants substantially interfered with Plaintiff's property by knowingly or intentionally taking possession of the property; and/or refusing to return the property after Plaintiff demanded its return.

66. Plaintiff did not consent.

67. Plaintiff was harmed.

68. Defendants' conduct was a substantial factor in causing Plaintiff's harm.

## THIRD CAUSE OF ACTION

**(Declaratory And Injunctive Relief – Against All Defendants)**

69. Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

70. As alleged herein, Defendants' demand that Plaintiff produce all remaining bones in her possession for the Coroner's physical inspection is improper and unlawful, since they have rejected inspecting the other bones on several occasions, and on which agreement Plaintiff has relied.

71. As alleged herein, the Defendants' threat to send the shin bone and all remaining bones for further DNA testing is improper, wrongful and unlawful in that: (a) it constitutes a fraudulent attempt to conceal and protect the defective opinions of their consultant and to forestall the need for a full investigation into prior cases where the alleged expert has rendered an opinion; (b) it seeks to force Plaintiff to collude with destruction of evidence when the Defendants have previously rejected the remaining bones as subjects for inspection and have no lawful basis on which to demand them; and (c) it enables them to continue to refuse to modify the Death Certificate when credible evidence demonstrates the remains to be those of Jack Cantin and they have no lawful basis on which to justify their conduct.

72. An actual controversy has arisen and now exists between Plaintiff and the Defendants concerning their respective rights and duties. A judicial declaration is necessary and appropriate at this time under the circumstances in order that Plaintiff may ascertain her rights and duties as alleged herein.

73. Plaintiff has demanded that Defendants stop their wrongful conduct, but Defendants have refused and continue to refuse to refrain from that conduct. Unless and until enjoined and restrained by an order of this Court, Defendants' wrongful conduct will cause great and irreparable injury to Plaintiff in that if Defendants are permitted to continue to threaten and make demands of Plaintiff,

Plaintiff will forfeit her rights with respect to the remains of her son and will be forced to collude with a miscarriage of justice.

74. As a proximate result of the Defendants' wrongful conduct, Plaintiff has been damaged and will be damaged in an amount not yet ascertained.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

1. For a temporary restraining order, and preliminary and permanent injunctions, enjoining and restraining the Defendants and their employees and agents from engaging in the policies, practices and conduct complained of herein;

2. For a declaratory judgment that Defendants' policies, practices and conduct as alleged herein violate Plaintiff's rights under the United States constitution;

3. For an order directing Defendants to modify the Death Certificate of Jack Cantin, so his remains may be buried next to his father;

4. For damages in an amount to be determined according to proof;

5. For costs of suit and attorney's fees as provided by law;

6. For such other relief as the Court deems just and proper.

DATED: October 18, 2021

CAPPELLO & NOËL LLP

By: *__/s/ A. Barry Cappello__*
A. Barry Cappello
Leila J. Noël
Wendy D. Welkom

Attorneys for Plaintiff

## DEMAND FOR TRIAL BY JURY

Plaintiff demands a trial by jury of all issues so triable in this action.

DATED: October 18, 2021

CAPPELLO & NOEL LLP

By: *_/s/ A. Barry Cappello_*
A. Barry Cappello
Leila J. Noël
Wendy D. Welkom

Attorneys for Plaintiff